UNITED STATES DISTRICT COURT                    c
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

WANDA GAIL RICHARDSON            CIVIL ACTION NO. 1:16-CV-00007

VERSUS                          JUDGE TRIMBLE

U.S. COMMISSIONER OF            MAGISTRATE JUDGE PEREZ-MONTES
SOCIAL SECURITY

---

## REPORT AND RECOMMENDATION

Wanda Gail Richardson ("Richardson") filed an application for period of disability, Social Security Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") on July 19, 2013. (Doc. 10, pp. 160, 166). Richardson alleged a disability onset date of September 15, 2010. (Doc. 10, p. 166). Richardson's DIB and SSI claims were initially denied by the Social Security Administration on October 23, 2013. (Doc. 10, p. 110).

A *de novo* hearing was held on May 7, 2014, before an administrative law judge ("ALJ"). Richardson appeared with Peter Lemoine, attorney for claimant, and Mark Chairs, a vocational expert ("VE"). (Doc. 10, p. 51). At the hearing, Richardson amended the alleged onset of disability to March 13, 2013, and withdrew the request to reopen the prior decision. (Doc. 10, p. 57). The ALJ denied Richardson's claim on August 22, 2014. (Doc. 10, p. 14). The ALJ found that Richardson's chronic obstructive pulmonary disease (COPD), osteoarthritis of the lumbar spine, status-post arm surgery, depression, and history of polysubstance abuse were "severe impairments" at step 2. (Doc. 10, p. 19). The ALJ further found that these impairments did not meet

the requirements of a listed impairment. (Doc. 10, p. 20). The ALJ also determined Richardson's residual functional capacity ("RFC") and concluded that she was able to perform light work, except she cannot perform above-shoulder motions with her dominant upper extremity, and she requires an indoor, climate-controlled environment. The ALJ further found that, due to depression, Richardson is able to perform simple, 1-2-3 step instructions, but should have no direct interaction with the public, limited interaction with coworkers, and is limited to working with things rather than people. She cannot perform fast-paced production work, or work that requires changing details or changing pace. (Doc. 10, p. 22). The ALJ further found that Richardson was unable to perform any past relevant work. (Doc. 10, p. 26).

The Appeals Council denied Richardson's request for review and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner"). (Doc. 10, p. 7). The Appeals Council then set aside their earlier decision to consider additional information. The Appeals Counsel again denied Richardson's request for review. (Doc. 10, p. 1).

Richardson next filed this appeal for judicial review of the Commissioner's decision. Richardson argues that the ALJ erred in her analysis of the medical opinion evidence, and the other source opinion evidence; that the ALJ's RFC assessment and hypothetical questions failed to reflect Richardson's impairments; that the ALJ erred in her reliance on the VE testimony regarding significant numbers; and that the Appeals Council erred by failing to follow its own procedures after receipt of post-hearing medical and vocational evidence. (Doc. 17).

The Commissioner filed a brief in response to Richardson's appeal (Doc. 26), to which Richardson replied (Doc. 29). Richardson's appeal is now before the Court for disposition.

<u>Eligibility for DIB</u>

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be disabled as defined by the Social Security Act. <u>See</u> 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than 12 months. <u>See</u> 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. <u>See</u> 42 U.S.C. § 423(d)(2).

<u>Scope of Review</u>

In considering Social Security appeals, the Court is limited by 42 U.S.C. § 405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. <u>See</u> <u>McQueen v. Apfel</u>, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. <u>See</u> <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994) (citing <u>Richardson v. Perales</u>, 402

U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  See Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## I.  Summary of Pertinent Facts

Richardson was 46 years old when she applied for DIB and SSI on July 19, 2013. (Doc. 10, pp. 160, 166). Richardson worked as a home health aide, a cashier, and as a stocker prior to her first application for benefits in 2010. (Doc. 10, pp. 200-01).

A.   <u>**Medical Records**</u>

<u>Examination by Dr. Fay Thrasher</u>

On September 21, 2013, Richardson was examined by Dr. Fay C. Thrasher ("Dr. Thrasher"), a Licensed Clinical Psychologist. (Doc. 10, p. 356). Richardson alleged issues lifting her right arm post-surgery, bipolar disorder, severe depression, mood swings, and COPD. (<u>Id.</u>). Dr. Thrasher noted that Richardson had rotten and missing teeth, and that she was transported to the interview by her sister. Dr. Thrasher also noted that Richardson had a history of psychiatric treatment, and reported no hospitalizations for mental health issues. Dr. Thrasher noted that Richardson was compliant with her prescriptions, which included Haldol, Zoloft, Bupropion, Buspirone, Vistaril, Trazodone, and Prazosin. Richardson also gave a prior history of sexual abuse and drug abuse, but noted that she had been clean for 3.5 years. (Doc. 10, p. 356).

Additionally, Dr. Thrasher stated that Richardson was capable of limited standing (for long periods), sitting, and walking, due to back pain. She could only lift approximately 25 pounds due to arm pain. She could bathe, groom, and dress herself with assistance, since she needed help brushing her hair. Richardson shopped, did light cooking, and performed light household chores, such as laundry. (Doc. 10, p. 357). Dr. Thrasher stated that Richardson was polite and cooperative in the interview, and related well to others on a one-to-one basis. Dr. Thrasher additionally stated that Richardson's thinking was organized and goal-directed, she denied delusions, admitted to ideas of reference, and thought that people talk about her.

(Doc. 10, p. 357). Richardson admitted she hears voices mumbling, which had been going on for about a year. (Doc. 10, p. 358).

Dr. Thrasher stated that Richardson's mood appeared depressed, and that Richardson stated she sleeps poorly. She admitted suicidal ideation, with no current intent, and there had been no suicide attempts. (Id.). Dr. Thrasher noted that her attention and calculation skills were fair, her comprehension was good, and her estimated intellectual functions were within the low average range. Her concentration and persistence were fairly good, and her pace was good. Dr. Thrasher noted Richardson could perform repetitive skills, and could perform a three-stage command. (Id.).

Richardson's diagnosis included, at present, major depressive disorder that was severe and recurrent with psychotic features. By patient history, the diagnoses included major depressive disorder that was severe and recurrent, but without psychotic features, polysubstance abuse in remission, and sexual abuse. Her GAF was 55.[1] (Doc. 10, p. 359). Prognosis was guarded. (Id.). Dr. Thrasher noted that

---

[1] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR"). GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness. The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year. See DSM-IV-TR at 32-34. The GAF scale goes from 0-100: **91-100** - superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because

Richardson could fully understand, minimally retain, and fully follow simple to fairly complex instructions within normal limits. Additionally, Richardson was able to maintain attention and concentration to perform simple to complex work tasks for a two-hour work block. (Id.). Her ability to relate to co-workers and the general public was limited due to depression, but she was minimally capable of accepting supervision. (Id.). Her ability to sustain effort and persist at a normal pace over the course of a routine 40-hour work week was diminished due to symptoms of depression, and her ability to tolerate the stress, pressure, and social environment of a work setting was also diminished. (Id.).

Mental Health Center of Central Louisiana Records

Richardson's prior treatment with the Mental Health Center of Central Louisiana is discussed more fully in the Attorney/Representative Supplied Evidence — Mental Health of Central Louisiana section.

---

of his or her many positive qualities, no symptoms; 81-90 - absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns; 71-80 - if symptoms are present, they are transient and expectable reactions to psycho-social stressors, not more than slight impairment in social, occupational, or school functioning; 61-70 - some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships; 51-60 - moderate symptoms OR moderate difficulty in social, occupational, or school functioning; 41-50 - serious symptoms OR serious impairment with social, occupational, or school functioning; 31-40 - some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood; 21-30 - behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgement OR inability to function in almost all areas; 11-20 - some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication; 1-10 - persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death; and 0 - inadequate information. See DSM-IV-TR, at 34; see also Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

On March 19, 2012, progress notes indicate that Richardson had low energy and motivation, and had a slow progression of improved mood. However, the therapist additionally noted that Richardson was sad since that month was the anniversary of her mother and niece's death. Richardson stated she wanted to give the Zoloft more time to work before considering a medication change. (Doc. 10, p. 371).

On April 18, 2012, Richardson reported that she was hearing voices, but never told anyone due to a fear of being "locked up." Her speech and affect were appropriate, and she smiled and conversed in a friendly manner. She reported continued depressed mood and was referred back to the physician for medication adjustment. (Doc. 10, p. 372).

On May 2, 2012, Richardson had a check-up. Richardson's mood was depressed, and she had frequent anxiety, along with poor energy, She also heard voices, but had no delusionality. The doctor noted she slept well, but with some restlessness. She was clean, neat, and casually attired, and was friendly and cooperative. Her medications, including Zoloft, Vistaril, and Trazodone were continued, while Bupropion and BuSpar were added. (Doc. 10, p. 367).

On May 30, 2012, the therapist indicated that Richardson could not tell much of a difference from medication adjustments, but noted that it had only been one month since the BuSpar and Wellbutrin were added. Richardson reported hearing voices, but was unable to understand the words. She reported sleeping better, and reported having some panic symptoms and frequent anxiety. (Doc. 10, p. 373).

On July 23, 2012, progress notes indicated that Richardson was still hearing voices, but could not make out what they were saying. She reported sleeping well, and stated her mood was somewhat improved, but that she was still depressed at times. She additionally stated that her nervousness and anxiety had improved. (Doc. 10, p. 375).

On July 25, 2012, Richardson had a check-up. Richardson's mood, sleep, and anxiety were better, but she was still bothered by hearing voices and had visual tricks. The doctor noted that Richardson had some low grade referential delusions, but that they were no longer present. She was cooperative and help seeking, but her affect was blunted. The doctor added Bupropion and Risperdal to her medications, and the BuSpar, Zoloft, and Trazodone were continued. (Doc. 10, p. 368).

On August 22, 2012, progress notes indicated that Richardson was still hearing voices, but could not understand what they were saying, and that she was not sleeping well. Richardson reported a lot of anxiety and nervousness, and panic attacks. She was calm and cooperative, and she saw the physician for medication changes. (Doc. 10, p. 376). During the pharmacologic management session that same day, the physician noted that Richardson was still hearing voices, although it was somewhat lessened. She was anxious and sleeping poorly. She was noted to have chronic pain, and to be mildly depressed and tense. The Risperdal, BuSpar, and Trazodone were increased, the Zoloft and Bupropion were continued, and Vistaril was resumed. (Doc. 10, p. 369).

On September 17, 2012, progress notes indicate that Richardson had been depressed several days the prior week. Additionally, she was still hearing voices, but could not understand what they were saying. She indicated she was sleeping well. (Doc. 10, p. 377).

On October 15, 2012, Richardson reported that she was doing better and her mood was good. She noted she had one, ten-minute crying spell two weeks prior, and that she had not heard any voices for about three weeks. Richardson indicated she was sleeping well. The notes stated there had been much improvement over the last month. (Doc. 10, p. 378).

On December 12, 2012, progress notes indicated that Richardson had missed the prior month's appointment due to a lack of transportation, and that she had been out of medication for about two weeks as a result. Richardson indicated she had been depressed some, but that it may have been due to the medication issue and the upcoming holidays. She stated she heard voices again, but could not hear what they were saying, and that her sleep was "pretty good." The therapist and Richardson discussed transferring her case closer to Marksville BHL, as that was closer to her home. Richardson further stated her energy was not good, but that she watched television and worked in her yard some. (Doc. 10, p. 380).

On October 3, 2011, June 29, 2012, and December 27, 2012, Richardson had CT scans performed on her chest that showed mild chronic change of bronchitis and images consistent with benign granulomas, and an emphysematous bulla on the last of the scans. (Doc. 10, pp. 382-83, 388-89).

On January 29, 2013, Richardson had a check-up where the physician noted she was doing "mostly well" on current medications except for increasing weight gain, depressive periods, ongoing anergia, and bouts of tension and anxiety. Richardson still heard faint voices on rare occasions, but could not discern their words. The voices were louder with menacing messages prior to medication. She was sleeping well. Her medications were adjusted and it was noted she would be moving to Marksville soon and that she should be followed by the MHC in that area. (Doc. 10, p. 370).

On May 29, 2013, Richardson received an x-ray on her lumbar spine for a history of low back pain. No signs of fractures or bone destruction were present, and disc spaces were well maintained. The impression was of a normal appearing lumbar spine. (Doc. 10, p. 412). On June 17, 2013, Richard received an MRI on her lumbar spine. There were no significant size disc protrusions or extrusions, and no evidence of spinal stenosis. There were chronic changes of inter facetal osteoarthritic disease at multiple levels. Otherwise, there was a normal appearance of the lumbar spine. (Doc. 10, p. 419).

<u>Avoyelles Mental Health Clinic</u>

On February 26, 2013, Richardson met with Licensed Clinical Social Worker Melanie Moreau ("LCSW Moreau" or "Moreau"). Richardson had transferred from Pineville, as her residence was closer to the Avoyelles Mental Health Clinic ("AMHC") location. Progress notes indicated Richardson was stable on her medications. (Doc. 10, p. 449).

On April 25, 2013, Richardson met with Jack Etheridge ("Etheridge"), a psychiatric nurse practitioner. Richardson was calm and cooperative, and denied audio or visual hallucinations. She indicated she was feeling down and had decreased energy. She was also compliant with her medications, and indicated that she was sleeping well. She said she spent her time watching television, listening to the radio, cooking, cleaning, visiting with friends, shopping, and fishing. (Doc. 10, p. 447).

On May 14, 2013, Richardson met with LCSW Moreau. Richardson indicated that she was doing better since her medications were changed, and that she was not sleeping as much during the day, though she had some trouble sleeping at night since the Trazodone was decreased. No major problems were reported at the time. (Doc. 10, p. 446).

On May 26, 2013, Richardson met with LCSW Moreau. Richardson reported continued depression and some anxiety, although the medications were helping a little. She indicated she was having bad nightmares and would wake up crying. (Doc. 10, p. 448).

On May 31, 2013, Richardson met with LCSW Moreau. Progress notes indicate that Richardson was doing well on the medications and there were no major issues at the time. (Doc. 10, p. 445).

On June 27, 2013, Richardson met with LCSW Moreau. Richardson indicated an increase in depression in the prior two weeks, more crying spells, low energy, and low motivation to even get dressed in the morning. Richardson indicated she was taking all her medications as prescribed. However, LCSW Moreau also noted that she

had only been taking her Vistaril twice a day, although the order and bottle said up to three times a day. Richardson indicated she would try it to see if taking it three times a day would help. (Doc. 10, p. 444).

On July 18, 2013, Richardson met with Etheridge. Richardson was calm and cooperative, and denied audio and visual hallucinations. She indicated her mood was down due to nightmares. (Doc. 10, p. 443).

On July 25, 2013, Richardson met with LCSW Moreau. Richardson indicated she was doing fine on her medications. Prazosin was added to her medication list for nightmares. (Doc. 10, p. 442).

On August 13, 2013, Richardson met with Teresa Juneau, a Registered Nurse for a medication review. Richardson reported medication compliance and denied side effects, and stated that her sleeping was good. She denied audio or visual hallucinations, and her mood was stable. (Doc. 10, p. 441).

On August 22, 2013, Richardson met with LCSW Moreau. Progress notes indicated that Richardson was doing well on her medications, but that she was not sleeping well and was having nightmares. Richardson also indicated she was hearing voices, but could not understand them. (Doc. 10, p. 440).

On September 19, 2013, progress notes indicated that Richardson was calm and cooperative, denied depressive, hypomanic, and manic symptoms, and denied audio and visual hallucinations. She reported trouble sleeping at times, but reported that medication reduced her nightmares. She additionally indicated that she spends

her time watching television, cooking, cleaning, and visiting with family and friends. Her medication was continued. (Doc. 10, p. 439).

    Attorney/Representative Supplied Evidence – Huey P. Long Medical Center

    Richardson's attorney, Peter Lemoine, supplied ODAR with copies of records from Huey P. Long Medical Center covering the period from June 6, 2008 to May 29, 2013. (Doc. 10, p. 450).

    Richardson presented for a complaint of back pain on October 6, 2010. (Doc. 10, p. 475). She was diagnosed with lumbar strain. (Doc. 10, p. 474).

    On November 10, 2010, Richardson presented with a cough and was diagnosed with bronchitis. (Doc. 10, pp. 469-70). She presented back to the outpatient clinic on November 15, 2010 (Doc. 10, p. 468), and to the emergency department on December 4, 2010 with a continuing cough (Doc. 10, p. 467).

    On December 4, 2010, Richardson received a chest x-ray. It showed questionable changes of bronchitis and indication of incidental granulomas. (Doc. 10, p. 530). On December 9, 2010, a physician indicated that the results were consistent with the referral diagnosis indicating COPD. (Doc. 10, pp. 528-29). Richardson had another CT scan performed on June 15, 2011. (Doc. 10, p. 525). A repeat study with contrast media was recommended. (Doc. 10, p. 525-26). That study was performed on July 1, 2011, and it indicated that the nodular lesions were most likely due to incidental non-calcified granulomas and a repeat CT in three to six months was recommended. (Doc. 10, p. 523-24).

On May 29, 2013, an x-ray of the lumbar spine was performed. It showed no signs of fractures or bone destruction, and disc spaces were well maintained. The impression was of a normal appearing lumbar spine. (Doc. 10, p. 522).

The rest of the medical records in this section generally cover problems with Richardson's teeth and issues relating to cavities, abscesses, and pain. (See generally Doc. 10, pp. 477-507). She had multiple alveolar abscessed mandibular teeth surgically excised on August 11, 2010. (Doc. 10, p. 476).

Attorney/Representative Supplied Evidence – Avoyelles Mental Health

Lemoine also supplied additional records from AMHC covering the period from September 9, 2011 to April 15, 2014.

On December 7, 2011, Richardson met with a physician. Progress notes indicated that Richardson was having "75% fewer crying spells," was sleeping better at night, and was tolerating the medications well. She was further advised that it had not been long enough to see the full effect of the medications. (Doc. 10, p. 543).

On January 20, 2012, Richardson met with a provider at AMHC. Richardson reported she was not sleeping well, that she is "super sensitive," gets angry easily, and was having mood swings. She reported continued pain in her arm that had been broken, but which had healed. (Doc. 10, p. 541).

On October 25, 2013, Richardson met with Moreau. Richardson indicated she was doing fine on her medications and was sleeping well. Her depression was stable at the time, and the Prazosin was helping with her nightmares. (Doc. 10, p. 538).

On March 27, 2014, Richardson met with Etheridge. She was calm and cooperative, and denied audio and visual hallucinations. She indicated that she was sad over a breakup with her boyfriend. (Doc.10, p. 536).

On April 15, 2014, Richardson met with Moreau. Progress notes indicated that Richardson was doing well on her medications, but still had some days with depression. Richardson indicated that she and her boyfriend broke up in December and that she had been sleeping a lot, but after her prior meeting with Etheridge, it had only been at night. (Doc. 10, p. 535).

<u>Attorney/Representative Supplied Evidence – Mental Health of Central Louisiana</u>

Lemoine also attached additional copies of records from Mental Health of Central Louisiana covering the period from September 9, 2011 to March 4, 2013.

From August 18, 2011 to January 29, 2013, Richardson was seen for an initial intake assessment and follow up for complaints of depression, as well as counseling. The discharge summary noted that Richardson was actively engaged in the treatment plan and attended appointments regularly. (Doc. 10, p. 551). Her fundamental strengths were noted as "perseverance" (quotations in original) and fair health. Her fundamental needs were listed as income and employment. (Doc. 10, p. 551).

On September 12, 2011, Richardson's progress notes indicated that she reported feeling a little better, but admitted to a crying spell. She also reported difficulty sleeping, and that she felt a little worthless on Saturday. (Doc. 10, p. 558).

On September 23, 2011, Richardson's progress notes indicated difficulty sleeping, with some daytime napping, and low energy and motivation. She reported

that she felt that Zoloft was helping her as she was not crying as much. (Doc. 10, p. 557).

On October 4, 2011, Richardson's progress notes indicated that she felt better, but her mood was still down. She was chronically tense, restless, worried, and anxious and had difficulty sleeping for the past three years. Her medications were adjusted. (Doc. 10, p. 556).

On October 24, 2011, Richardson's progress notes indicated that she was still crying two to three times a week, and was worrying about her health and financial problems. She reported low energy, difficulty getting motivated, mood swings and agitation, and difficulty sleeping. (Doc. 10, p. 556).

On December 7, 2011, Richardson's progress notes indicated that she reported "75% fewer crying spells and is sleeping much better at night." She was advised that she had not been on the medications long enough to see the full effect of the treatment. (Doc. 10, p. 555).

On January 6, 2012, Richardson's progress notes indicated that Richardson reported some anxiety, but that the medication helped with it, that she has some trouble sleeping, and that she was calm and cooperative. She reported feeling down due to her life situation, but reported no audio or visual hallucinations. Her medications were adjusted. (Doc. 10, p. 554).

On January 20, 2012, Richardson had an appointment and her progress was reviewed. Richardson reported she was not sleeping well, was "supersensitive," got angry at people, and had mood swings. (Doc. 10, pp. 553-54).

On February 22, 2012, Richardson had an appointment and her progress was reviewed. It was reported that she was tense and anxious. She stated that her mood changes a lot, but she still often felt down. She showed heavy affect and some dysphoria, but had no thought abnormalities. Her medication was adjusted. (Doc. 10, p. 553).

On July 25, 2012, Richardson was seen for a check-up. Her mood, sleep, and anxiety levels were better, but she reported that she still heard voices, and that she has "visual 'tricks,' probably illusions." Her medications were adjusted. (Doc. 10, p. 552).

LCSW Moreau Functional Capacity Assessment

LCSW Moreau conducted a Functional Capacity Assessment on Richardson on May 16, 2014. The assessment was in check-list form. Moreau judged Richardson to have moderate limitations in: understanding, remembering, and carrying out detailed instructions (doc. 10, p. 566); the ability to work in coordination with or proximity to others without being (unduly) distracted by them; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (doc. 10, p. 567). Moreau also checked the box to indicate that she felt that Richardson would not be able to perform full-time work without an unacceptable rate of absenteeism. (Doc. 10, p. 568).

There was a section reserved for listing diagnoses, positive signs on mental status examination, as well as results of psychological testing. If the claimant was

diagnosed with a substance use disorder, it was indicated to state whether or not it was ongoing or in remission. She noted that Richardson had major depression with psychosis. She also stated that Richardson still had some symptoms of depression, like poor concentration and no energy. She stated that Richardson feels worthless. She additionally stated that Richardson had no substance use. Moreau writes that Richardson had recently heard voices as of two weeks ago, but that she could not understand what they were telling her and it scared her. (Doc. 10, p. 568).

### Administrative Hearing

At her May 2014 administrative hearing, Richardson testified that she was 47 years old, 5'4' tall, weighed 139 pounds, right handed, and does not drive. (Doc. 10, pp. 55-55). Richardson further stated she was separated, and that her two sons, neither minors, lived with her. (Doc. 10, p. 55). She stated that she graduated high school. (Doc. 10, p. 55). Richardson indicated she had stopped working in September 2010, when she had been working as a stocker in a store. (Doc. 10, p. 56). Prior to that, she worked as a home health aide, and in different cashiering positions. (Doc. 10, p. 56). She stated the reason she stopped working was because she injured her arm at work. (Doc. 10, p. 56). At this point, Lemoine stated that the dates of her disability has been amended to when Richardson's depression became severe in March 2013, as there had been a prior disability decision. (Doc. 10, p. 57).

Richardson stated that her depression became very bad in March 2013, and that it related to her past sexual abuse. She stated that she had crying spells, that she did not like being around people, and that she did not have energy to do anything.

(Doc. 10, p. 57). She noted that the arm injury and subsequent surgery also affected her at the time, along with COPD. (Doc. 10, p. 58).

Richardson noted that on an average day, she sleeps a lot, watches television, and does a load of laundry "here and there." (Doc. 10, p. 58). She stated she has a TV dinner at lunch time, and that she fixes dinner for herself. (Doc. 10, pp. 58-59). She indicated she could lift "maybe 20 pounds" and that she has trouble lifting her arm above her head. (Doc. 10, pp. 59-60). While her children take care of the outside work, she does dishes and sweeps and mops when she is having a good day. (Doc. 10, p. 60). In response to a question asking whether she could stay focused for an hour TV show, she stated that she would normally fall asleep. She also stated that she can sleep at night with the medication she takes, and that her appetite comes and goes. (Doc. 10, p. 60).

Richardson noted that she had been seeing a doctor before Huey P. Long closed, but that she had been attempting to get an appointment at the new Cabrini Center. (Doc. 10, p. 61). Additionally, she goes to Avoyelles Mental Health. (Id.). She stated she was taking medications including Zoloft and Bupropion for depression, Prazosin for nightmares, Trazodone for sleep, Vistaril for anxiety, Haloperidol for psychosis, and Buspirone for anxiety. (Doc. 10, p. 61). Richardson indicated she had been having problems with psychosis within the last year. Specifically, she heard people talking, but she could not understand them, sometimes two or three times a month, and sometimes more often. (Doc. 10, p. 61). She stated that she feels like they are going

to hurt her. (Doc. 10, p. 62). She reported she can get along with people, but it depends on her mood swings, and that she cannot be around a lot of people. (Doc. 10, p. 62).

Richardson further stated she can walk for a period of time but gets short of breath, and can only stand for so long until her back hurts. (Doc. 10, p. 62).  Cold weather hurts her arm. (Doc. 10, pp. 62-63).

During questioning by her attorney, Richardson reiterated that she was on seven different medications for her psychiatric problems, and that Dr. Carbo assessed her with major depressive disorder, severe and recurrent with psychotic features. (Doc. 10, p. 63). In that examination for Social Security with Dr. Carbo, she could not identify any of three objects after five minutes and does not handle finances at home. (Doc. 10, p. 63). She stated she thinks it would be hard to handle normal job stress with her depression. (Doc. 10, p. 64). As a result of her sexual abuse and depression, she started having flashbacks and has nightmares every so often. (Doc. 10, p. 64). She estimated that there were about fifteen days in a typical month where she cannot do housework due to her depression. (Doc. 10, p. 64). She stated the voices she hears started about a year prior and that they stay about the same, as opposed to having gotten better or worse. (Doc. 10, p. 65). She states she cannot drive on those medications. (Doc. 10, p. 66).

The VE testified that Richardson's job as a home health aide was medium work, SVP: 3 (DOT 354.377-014). Richardson's job as a cashier, was light work, SVP: 2 (DOT 211.462-010). Richardson's job as a retail stocker was heavy work, SVP: 4 (DOT 299.367-014). (Doc. 10, p. 67).

The ALJ posed a hypothetical involving a woman with the same age and education level, and with the same work history, who would testify as Richardson had done at the hearing. The VE responded that the individual would not be able to return to any of her past work, as the testimony indicated that the individual would not be able to perform at least a sedentary level of employment on an ongoing, eight hour basis. (Doc. 10, p. 67).

The ALJ posed another hypothetical with the same age, education, and past relevant work as Richardson, who would be able to lift twenty pounds occasionally, or ten pounds frequently, or stand six hours of an eight hour day. The ALJ gave additional limitations of no above shoulder activity with her dominant upper extremity, and an indoor, climate controlled environment due to COPD. The ALJ additionally added a limitation of simple one, two, three step instructions, no direct interaction with the public, limited interaction with coworkers, and work mainly with things, not people. The ALJ stressed that it would be simple, repetitive, low stress type of work, in a non-fast paced environment. (Doc. 10, p. 68). The VE testified that these limitations did not fit Richardson's past relevant work, but that she could work as a housekeeping cleaner, SVP: 2 (DOT 323.687-014), light work, and stated that the national number for that position is 894,000, while Louisiana specifically was 15,600. The VE added garment sorter, SVP: 2 (DOT 222.687-014), light work, and stated that the national number of jobs is 218,000, while Louisiana is 6,350; and basket filler, SVP: 1 (DOT 529.687-010), light work, and stated that the national number is 419,000, while Louisiana is 5,200. (Doc. 10, p. 68-69).

Following a question concerning unscheduled breaks from the ALJ, the VE testified that those types of breaks would not be tolerated in these types of jobs. (Doc. 10, p. 69).

The ALJ then allowed Richardson's attorney to ask further questions of the VE. The VE noted that his interpretation of limited coworker interaction meant no team work activities (doc. 10, p. 69), and less than frequent coworker interaction (doc. 10, p. 70), and was based on his general experience as a VE, since the DOT or the SOC could not tell them how frequent someone would interact with coworkers or supervisors. Furthermore, the jobs numbers were based on the whole SOC code number, as opposed to the specific DOT number. (Doc. 10, p. 70). Specifically in reference to the housekeeper position, there were nine DOT titles under the same SOC code number as the housekeeper job, and four of them were light or sedentary. However, the VE could not say how many were unskilled. (Doc. 10, p. 70). Therefore, although the job numbers were for the whole SOC code number, some of the DOT titles would not fit the hypothetical. (Doc. 10, p. 71). Lemoine repeated the questions for basket filler and garment sorter jobs.

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. § 404.1520(a) and § 416.920(a). The sequential process required the ALJ to determine whether Richardson (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the

past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. See Greenspan, 38 F.3d at 237.

In this case, the ALJ found that Richardson has not engaged in substantial gainful activity since March 13, 2013, that she meets the insured status requirements of the Social Security Act through June 30, 2014, and that she has severe impairments of chronic obstructive pulmonary disease (COPD), osteoarthritis of the lumbar spine, status-post arm surgery, depression, and history of polysubstance abuse, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1. (Doc. 10, pp. 19-20). The ALJ also found that Richardson was able to perform light work, except she cannot perform above-shoulder motions with her dominant upper extremity, and she requires an indoor, climate-controlled environment. (Doc. 10, p. 22). The ALJ also found that Richardson is able to perform simple 1-2-3- step instructions, but should have no

direct interaction with the public, limited interaction with coworkers, and is limited to working with things rather than people. She cannot perform fast-paced production work or work that requires changing details or changing pace. (Doc. 10, p. 22).

The ALJ found that the Richardson's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Doc. 10, p. 23). There were no objective findings consistent with COPD during the alleged period of disability, but since COPD is a chronic, incurable disease, and Richardson had a long history of treatment for the condition, the ALJ considered the impairment in the RFC. Furthermore, there was no evidence of shoulder surgery, but the ALJ took claimant's word as to the condition and any continuing limitations that exist. (Doc. 10, p. 23). Richardson's mental health treatment had been consistent, but the ALJ found that the records showed that Richardson improved with psychotherapy and pharmacological treatment. (Doc. 10, p. 23). The ALJ additionally found that Richardson had made inconsistent statements regarding matters relevant to the issue of disability, such as the statements regarding her nightmares, suicidal thoughts, and auditory hallucinations, as well as medication side effects, which did not align with her statements to mental health professionals. (Doc. 10, p. 24).

The ALJ gave great weight to the portions of Dr. Thrasher's opinion regarding Richardson's ability to understand, minimally retain, and fully follow simple to fairly complex instructions, as it was supported by Dr. Thrasher's examination findings and Richardson's reported mood stability and diminished symptoms with continued treatment. (Doc. 10, p. 25). The ALJ gave limited weight to Dr. Thrasher's opinion

regarding a minimum capability of accepting supervision, diminished ability to tolerate stress and the pressure of a work setting, and diminished ability to sustain effort and persist at a normal pace. The ALJ found that evidence does support a finding of some limitation, but Richardson's continued progress indicates a higher level of functioning than opined. (Doc. 10, p. 25).

The ALJ gave LCSW Moreau's opinions little weight, as licensed social workers are not an acceptable medical source as defined in 20 C.F.R. § 1513. Furthermore, the ALJ stated that significant weight cannot be given to the opinions because they are not consistent with the preponderance of the opinions and observations by medical doctors. (Doc. 10, p. 25).  The ALJ additionally gave little weight to the state agency (DDS) medical experts who opined that Richardson's impairments were non-severe, as they were rendered by physicians wo never examined nor met with Richardson, and the opinions are not well supported. (Doc. 10, p. 26).

The ALJ found that claimant was unable to perform past relevant work. (Doc. 10, p. 26). The ALJ also found that jobs exist in significant numbers in the national economy that Richardson could perform. (Doc. 10, p. 27).

## II.  Law and Analysis

Richardson alleges four issues: (1) the ALJ erred in her analysis of the medical and other source opinion evidence; (2) the RFC and hypotheticals presented to the VE failed to reflect all of Richardson's impairments; (3) the ALJ erred in her reliance on the VE's testimony regarding the number of jobs available; and (4) the Appeals

Council erred by not following its own procedures regarding receipt of post-hearing medical and vocational evidence.

1. **The ALJ properly considered the medical and other source opinion evidence.**

Richardson argues that the ALJ erred by rejecting LCSW Moreau's opinion, which stated that Richardson is moderately limited in her ability to complete a normal workweek without interruptions from psychologically based symptoms, since Moreau is not an "acceptable medical source." Richardson argues the ALJ should have considered the nature, length, and frequency of treatment provided to Richardson by Moreau.

Licensed professional counselors, including social workers, are not "acceptable medical sources." 20 C.F.R. §§ 404.1513(a), 416.913(a). Only "acceptable medical sources can establish the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight." Thibodeaux v. Astrue, 324 Fed.Appx. 440, 445 (5th Cir. 2009). Medical opinions are statements from acceptable medical sources that "reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2). Only acceptable medical sources can offer medical opinions and be considered treating sources whose medical opinions may be entitled to controlling weight. Thibodeaux, 324 at 445.

In addition to the evidence from acceptable medical sources, the ALJ may use evidence from other sources to show the severity of the claimant's impairments and how it affects their ability to work. 20 C.F.R. §§ 404.1513(d), 416.913(a), 416.913(d). However, as factfinder, the ALJ has the sole responsibility for weighing the evidence. The ALJ may choose whichever physician's diagnosis is most supported by the record. Muse v. Sullivan, 925 F.2d 785, 790 (5th Cir. 1991). In weighing the medical opinion evidence, the ALJ considers the examining relationship, the treatment relationship, the length of the treatment relationship, the nature and extent of the treatment relationship, the supportability, and the consistency. 20 C.F.R. §§ 404.1527(c); 416.927(c).

However, depending on the facts of the case and after applying the factors for weighing the opinion evidence, a non-acceptable medical source opinion still may outweigh the opinion of an acceptable medical source. An example of this is if the non-acceptable source "has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." SSR 06-3p, 2006 WL 2329939, at *5.

The ALJ gave Moreau's opinions little weight, since she is not an acceptable medical source and therefore not bound to her statements. The ALJ further stated that significant weight could not be given to Moreau's opinions, because they were not consistent with the preponderance of the opinions and observations by the medical doctors in this case. Moreau presented her opinions via a form that gave options for checking boxes to indicate whether Richardson had limitations in

performing work related activities, with a space at the end to list diagnoses, positive signs noted on mental examinations, as well as results of psychological testing. (Doc. 10, pp. 566-68). Without more evidence supporting her position and a better explanation, the ALJ was not required to give more weight to Moreau's opinion.

Similarly, the ALJ gave portions of Dr. Thrasher's opinion great weight, based on Dr. Thrasher's examination findings and Richardson's reported stability and diminished symptoms with continued treatment, and gave limited weight to others, based on inconsistency with the evidence in the record. (Doc. 10, p. 25). Richardson's records show a history of depression, trouble sleeping, and nightmares. However, Richardson's treatment records also show that her symptoms improved with continued treatment and medication. (See doc. 10, p. 448 (on May 26, 2013, medications were helping "a little"); p. 445 (on May 31, 2013, Richardson was doing well on medications and had "no major issues at this time"); p. 378 (on October 15, 2012, there was much improvement over the last month, only one, ten minute crying spell); pp. 442, 444 (on June 27, 2013, Richardson had an increase in depression and was advised that the order and her prescription bottle says to take the Vistaril up to three times a day, and was to try it to see if it helps. On July 27, 2013, at her next session with Moreau, she advised that she was doing fine on her medications, and that additional medications had been added)).

To the extent that Richardson relies on evidence from an August 18, 2012 consultative examination report from Dr. Thrasher, that report was considered in

Richardson's first claim for disability, and is res judicata. (See Doc. 30). Dr. Thrasher's second consultative examination report is included in the record.

The ALJ resolves the conflicts in evidence, not the Court. The ALJ properly exercised her discretion and substantive evidence supports the ALJ's findings.

## 2. **The ALJ did not err in the RFC determination.**

Richardson next contends that the ALJ failed to account for all of Richardson's limitations. Richardson argues that Dr. Thrasher and LCSW Moreau agreed that Richardson's ability to sustain a forty-hour work week without an unreasonable number of interruptions was moderately diminished due to her psychological symptoms, and that the hypotheticals failed to account for the limitations. Richardson also argues the ALJ failed to account for Richardson's minimal ability to accept supervision, as the ALJ found that Richardson had "some limitation." Richardson states that the RFC and questions to the VE reflected no limitation in the ability to respond appropriately to supervision. Thus, Richardson states that the ALJ based her decision on a defective hypothetical.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985). The reviewing court must defer to the ALJ's decision when substantial evidence supports it even if the court would reach a different conclusion. Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir. 1998); Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995). A "no substantial evidence" finding is only appropriate if there is a

conspicuous absence of credible evidentiary choices or no contrary medical findings to support the ALJ's decision. Johnson, 864 F.2d at 343-44.

In her hearing decision, the ALJ noted that Dr. Thrasher had opined that Richardson was minimally capable of accepting supervision; had a diminished ability to tolerate the stress, pressure, and social environment of a work setting; and has a diminished ability to sustain effort and persist at a normal pace. While the ALJ had given great weight to the other portion of Dr. Thrasher's opinion, the ALJ only gave this part of the opinion limited weight. The ALJ stated that the evidence does support a finding of some limitation in these areas, but that Richardson's continued progress with treatment indicates a higher level of functioning than opined. (Doc. 10, p. 25). Furthermore, the ALJ gave Moreau's opinions little weight, which included the opinion that Richardson had a moderate limitation in her ability to complete a normal work week without interruptions from psychologically based symptoms. (Id.).

Thus, the ALJ posed a hypothetical of a woman with the same age, education, and past relevant work, who could lift twenty pounds occasionally or ten pounds frequently, stand six of eight hours a day. Additionally, the woman could not handle above should activity with her dominant upper extremity, would have to be an indoor, climate-controlled environment. Also, there would be limitations of simple 1-2-3 step instructions, no direct interaction with the public, limited interaction with coworkers, and work mainly with things, not people. The ALJ stressed it would be simple, repetitive, low stress type work in a non-fast paced environment. (Doc. 10, p. 68).

The ALJ's decision indicates a careful review of the evidence in the record as well as careful consideration of Dr. Thrasher's report. The ALJ noted that there was some limitation in these areas, but that Richardson had improved following treatment. Furthermore, the ALJ had noted that at the time of Dr. Thrasher's report, she had only been recently re-stabilized by medication, and since then, she had improved even more. Furthermore, she incorporated elements of Dr. Thrasher's opinion into her RFC, to account for the stress, press, and social environment of the work setting, by limiting interaction with co-workers and limiting the work to non-fast paced environments, and to jobs with simple, non-complex instructions. As the ALJ is only required to include in her hypothetical those functional limitations supported by the evidence and recognized by the ALJ, the lack of inclusion is not an error, as she did not find a supervision-related limitation, or a limitation relating to the number of breaks Richardson would need to take. (See. Doc. 10, p. 26).

The court therefore finds substantial evidence supports the ALJ's RFC finding.

3. **The ALJ erred in her reliance on the VE's testimony.**

Richardson next contends that the ALJ erred by relying on the VE's testimony. Specifically, Richardson argues that the job numbers that the VE gave were in error, as they were for the entire Standard Occupational Classification ("SOC") code as opposed to the specific Dictionary of Occupational Titles ("DOT") codes that represent the jobs of housekeeper, garment sorter, and basket filler jobs. For instance, when the VE gave the 894,000 national housekeeper jobs and 15,600 Louisiana housekeeper jobs, those numbers belonged to the entire SOC code, and there were

actually nine separate DOT codes within that SOC code. Furthermore, within those jobs available under the entire SOC code, the VE did not know how many would be unskilled, or within the different exertional levels. Therefore, Richardson argues, there is no reliable evidence regarding the number of jobs available to Richardson with her specific limitations.

At step five, the burden falls on the Commissioner to establish that the claimant is capable of performing work existing in significant numbers in the national economy. Work exists in the national economy "when it exists in significant numbers either in the region where you live or in several other regions of the county. It does not matter whether: (1) work exists in the immediate area in which you live; (2) a specific job vacancy exists for you; or (3) you would be hired if you applied for work." 20 C.F.R. § 404.1566(a)(1)-(3). Furthermore, "work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b).

Vocational experts use different governmental publications to find jobs particular claimants could perform. The DOT is a United States Department of Labor publication which gives each job type a specific code and gives detailed information related to the skill levels and exertional capacity of the job, amongst other information. Brault v. Social Sec. Admin., Com'r, 683 F.3d 443, 446 (2nd Cir. 2012). While highly valued, it only defines jobs, it does not report how many of the jobs are available in the economy. (Id.). The SOC codes are compiled in the Occupational

Employment Quarterly ("OEQ"). The SOC codes, however, do not contain the same

detailed information as the DOT codes, and raise difficulty in associating the SOC

numbers to the DOT job types.

> If, for example, ten DOT codes map to a single SOC code, saying there
> are 100,000 total positions available in that SOC code gives no
> information at all about how many positions each of the ten DOT codes
> contributed to that total. This becomes a problem if DOT titles with
> different exertion or skill levels map to the same SOC code. In such a
> situation, the OEQ apparently uses a rough weighted average algorithm
> – if ten DOT codes correspond to one SOC code, and four of those codes
> are light-duty, unskilled positions, then the OEQ will list 40% of the
> positions available in that SOC as light-duty, unskilled positions. That
> estimate may deviate significantly from the actual number of existing
> positions.

Id. at 447, n. 4. This is the problem pointed out by Richardson, and which has been

pointed out in similar cases in this district. See Smith v. Astrue, No. 1:13-CV-00366,

2014 WL 2112030, at *13-15 (W.D. La. May 8, 2014); Dauzat v. U.S. Com'r of Social

Sec., No. 1:13-cv-00953, 2014 WL 3764170 (W.D. La. July 30, 2014). The VE did not

give the number of jobs which Richardson could perform. Rather, the VE gave

numbers that pertain to the broader category of jobs found under the SOC code. (Doc.

10, p. 70). There are nine total DOT numbers under the same SOC code in which the

housekeeper job can be found. (Id.). Of these nine, four are light or sedentary, but the

VE did not know whether they were all unskilled. (Id.). The ones that would not be

unskilled would be inconsistent with the hypothetical. (Id.). For the SOC number

under which the garment sorter job could be found, there were 1,587 specific DOT

numbers, 928 which are either light or sedentary. (Doc. 10, p. 71). Again, the VE did

not know how many of those jobs would be inconsistent with the hypothetical. (Id.).

34

Furthermore, the VE did not testify based on his own experience whether those types of jobs exist in significant numbers; he solely gave the numbers for the SOC categories.

Therefore, substantial evidence does not support the ALJ's conclusion that work exists in significant numbers in the national or regional economies which Richardson can do. Since substantial evidence does not support this conclusion, the decision is incorrect as a matter of law. Therefore, Richardson's case should be remanded to the Commissioner for further proceedings to determine whether there are any jobs existing in sufficient numbers in the national or regional economies which Richardson could perform given her impairments.

4.  **The Appeals Council properly denied Richardson's request for review.**

Richardson argues that the Appeals Council erred by failing to follow its own procedures following receipt of post-hearing medical and vocational evidence. Specifically, she cites to 20 C.F.R. § 404.976(1), which states that the Appeals Council will consider any new and material evidence submitted to it which relates to the period on or before the date of the ALJ hearing decision. Richards argues that since Dr. Thrasher's 2012 report related to the period on or before the ALJ's decision, it should have been considered and addressed by the Appeals Council. Since the Appeals council did not evaluate the new evidence, Richardson argues the case should be remanded.

The Court's review is limited to considering the final decisions of the Commissioner. 42 U.S.C. § 405(g). When the Appeals Council declines to review the

ALJ's decision, the ALJ's decision becomes the final decision of the Commissioner. Sims v. Apfel, 530 U.S. 103, 106-07 (2000). The court may order additional evidence to be taken, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).

Richardson had filed a motion to supplement the record with Dr. Thrasher's August 18, 2012 consultative examination report. (Doc. 13). An order subsequently issued denying that motion, on the basis that *res judicata* applied, and that medical evidence from the initial proceeding cannot be subsequently reevaluated. As Dr. Thrasher's report was considered in a prior claim, and did not pertain to the relevant time period for Richardson's second claim, Dr. Thrasher's first report was determined to be neither new nor material evidence. (Doc. 30). Therefore, this claim is without merit.

Richardson additionally argues that the Appeals Council erred by failing to adequately evaluate new evidence which demonstrated that VE testimony relied upon by the ALJ was not based in fact also requires remand. Although the Court is limited to reviewing the decision of the Commissioner, for the reasons noted in Part 3, Richardson's case should be remanded to the Commissioner for further proceedings to determine whether there are any jobs existing in sufficient numbers in the national or regional economies which Richardson could perform given her impairments.

III.  **Conclusion**

Based on the foregoing, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Richardson's case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this ____2nd____ day of March, 2017.

Joseph H.L. Perez-Montes
United States Magistrate Judge